61 P.3d 522

In the Matter of the GRIEVANCE ARBI-
TRATION BETWEEN STATE OF HA-
WAI'I ORGANIZATION OF POLICE
OFFICERS (SHOPO), on behalf of An-
drea MEJIA, Union–Appellant,

v.

. HAWAI'I COUNTY POLICE DEPART-
MENT, County of Hawai'i, Em-
ployer–Appellee.

No. 23384.

Intermediate Court of Appeals of Hawai'i.

Dec. 11, 2002.

Randal S. Yoshida, Honolulu, on the briefs, for Union–Appellant.

Ivan M. Torigoe, Deputy Corporation Counsel, County of Hawai'i, On the briefs, for Employer–Appellee.

BURNS, C.J., LIM and FOLEY, JJ.

Opinion of the Court by LIM, J.

Appellant State of Hawai'i Organization of Police Officers (SHOPO), on behalf of police officer Andrea G. Mejia (Mejia), appeals the April 4, 2000 order of the circuit court of the third circuit, the Honorable Riki May Amano, judge presiding, that vacated a February 8, 2000 arbitration award in favor of SHOPO and against Appellee Hawai'i County Police Department (the Department), County of Hawai'i (the County). The Arbitrator held that she had arbitral jurisdiction over SHOPO's collective bargaining grievance. SHOPO had grieved the County's refusal to reallocate Mejia's position to a higher job classification, claiming that the County's refusal was "premised on bias, discriminatory, and unjust."

In assuming arbitral jurisdiction over SHOPO's grievance, the Arbitrator "exceeded [her] powers," Hawai'i Revised Statutes (HRS) § 658-9(4) (1993), under the County-SHOPO collective bargaining agreement (the CBA). Moreover, public policy, as expressed in HRS § 89-9(d) (Supp.2001 (section effective until June 30, 2002)) and also embodied in HRS § 76-14 (1993 & Supp.2001 (section effective until June 30, 2002)), excludes classification issues from arbitration under the CBA. We therefore affirm the order of the court.

## I. Background.

Mejia is a Police Officer II, PO–7, currently on a temporary reallocation of her job classification to Police Officer III, PO–9. She has over twenty years of exemplary service in the Department's Hilo district. On March 15, 1993, Mejia was recruited for the Police Officer III, PO–9 position in the Juvenile Aid Section (JAS) of the Hilo district. On October 24, 1995, Mejia discovered that the two Police Officer III, PO–9 positions in the Kona district JAS, occupied by Donna Springer (Springer) and Gregorio Alejo (Alejo), had been reallocated to the Detective, PO–11 classification. The Kona JAS did not have any Detective positions before the reallocation. The key distinction between the Police Officer III and Detective positions is that a Police Officer III operates under the supervision of a detective. Between April 12, 1993 and January 26, 1996, Mejia operated without a directly supervising detective and performed duties in the Hilo JAS comparable to those of a detective.

On November 2, 1995, Mejia and SHOPO submitted a reallocation request to County Mayor Stephen K. Yamashiro. At the time of this reallocation request, three detectives were working in the Hilo JAS. On January 8, 1996, Lieutenant William Silva recommended to County Police Chief Wayne G. Carvalho (Chief Carvalho) that Mejia's position in the Hilo JAS be reallocated to Detective, based on a comparison of her duties with those of the Kona JAS Detective positions worked by Springer and Alejo.

On January 26, 1996, Mejia was placed under the direct supervision of Detective Rodney Aurello (Detective Aurello), as required in a Police Officer III position, and was no longer required to perform detective duties. On May 16, 1996, Chief Carvalho responded to the reallocation request by granting a temporary, retroactive reallocation of Mejia's Hilo JAS position to Detective for the period Mejia had worked without a supervising detective, April 12, 1993 to January 26, 1996. Mejia's request for a permanent reallocation of her position to Detective was denied, and effective January 27, 1996, her position was reallocated back to a temporary Police Officer III classification.

## II. Procedural History.

### A. Action Before the Civil Service Commission.

On June 3, 1996, Mejia and SHOPO submitted an appeal of Chief Carvalho's decision

to the County's civil service commission (the Commission), requesting that the denial of their permanent reallocation request be overturned. The appeal alleged that HRS § 76-13(8)(C) (Supp.2001 (section effective until June 30, 2002))[1] had been violated. The appeal also cited HRS § 76-11((7)(C) (1993)).[2] The appeal alleged that

> [t]he [Department's] rejection of the reallocation request has denied [Mejia] just recognition for being directed to perform work at a higher classification for several years as well as subjecting her to disparate treatment, from other police officers who were in similar situations and were granted reallocations.

The Commission characterized the issue on appeal before it as,

> whether or not there were violations of civil service laws, rules, or regulations in [Chief Carvalho's] denial of [Mejia's] request for permanent reallocation from Police Officer (PO-7) to Detective Sargeant [ (sic) ] (PO-11) with the Hawai'i Police Department.

The Commission held hearings on August 20, 1996 and September 17, 1996. Mejia was represented at the hearings by a SHOPO official and SHOPO's counsel, and the Commission received evidence, including the sworn testimony of six witnesses. The Commission made conclusions of law and denied the appeal on November 26, 1996. Relevant conclusions of law concluded as follows:

> 3. Pursuant to [HRS § 91-10(5) ], [Mejia] has the burden of proof, including the burden of producing evidence as well as the burden of persuasion. The degree or quantum of proof required in this appeal shall be by a preponderance of the evidence.

4. [Mejia] has failed to meet her burden of proof, including her burden of producing evidence as well as her burden of persuasion.

5. Although [Mejia] has an exemplary work record; her abilities are unquestioned; and her superior officers highly recommended her reallocation to a detective position, [the Department's] decision to reallocate Springer and Alejo in the Kona-JAS and to not reallocate [Mejia] in the Hilo-JAS was a management decision based upon legitimate management considerations such as the availability and existence, or lack thereof, of detectives in each JAS.

6. Although [Mejia] has done and continues to do work substantially comparable to detective's work, she has been under the supervision of [D]etective Aurello since January 1996, which by definition puts her in the PO III position.

7. The reasons for the non-reallocation of [Mejia's] position to the position at issue are thus sufficiently substantiated and [the Department's] decision not to reallocate [Mejia's] position was proper and did not violate any civil service law, rule or regulation.

8. [Mejia] declined to testify as to any particular details regarding her allegations of preferential treatment received by other officers. Moreover, [Mejia] testified that officers Springer and Alejo deserved their reallocations. Thus, the Commission concludes that there is insufficient evidence to support [Mejia's] contention that there was any preferential treatment given to other officers by [the Department].

Although the Commission's decision was appealable to the court under HRS § 91-14 (1993), Mejia and SHOPO did not file an appeal within the thirty days allowed by statute.[3]

---

1. Hawai'i Revised Statutes (HRS) 76-13(8)(C) (Supp.2001 (section effective until June 30, 2002)) provided, in pertinent part, that the State director of human resources development "shall .... [r]eallocate positions to recognize material changes in duties and responsibilities or to correct a previous action[.]"

2. HRS § 76-11(7)(C) (1993) provided that " '[c]lass' or 'class of work' means the logical and reasonable grouping of duties and responsi-

bilities and their identification with respect to ... [q]ualification requirements of the work, so that positions which conform substantially to the same class would receive like treatment in the matter of title, and such personnel processes as salary assignment[.]"

3. HRS § 91-14 (1993) provides, in relevant part:

> (a) Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of re-

## B. The CBA Grievance and Arbitration.

On June 4, 1996, one day after initiating their appeal to the Commission, Mejia and SHOPO filed a CBA grievance over the reclassification issue. Their grievance alleged that the Department's denial of Mejia's request for reallocation of her position "was premised on bias, discriminatory, and unjust." The grievance was brought under three provisions of the CBA: Article 4, "Discrimination"; [4] Article 35, "Prior Rights"; [5] and Article 54(E) 1.b., "Compensation Adjustment Upon Reallocation." [6] Mejia and SHOPO sought permanent reallocation of Mejia's position to the Detective, PO–11 position, and retroactive pay from the date of the initial reallocation request.

The CBA grievance process is a four-step procedure. On November 15, 1996, in Step I, Police Captain Morton A. Carter (Captain Carter) denied Mejia's request for reallocation. Captain Carter found that

> reallocation of the Kona officers assigned to the [JAS] rested, in part, on the structure of the [JAS]. The structure of the Kona JAS included a section supervisor (detective) and two police officers who were responsible for all investigations. The Hilo JAS is comprised of a section supervisor (lieutenant), detectives and a police officer ([Mejia]) on temporary assignment to the section.

Captain Carter also found nothing to support a finding that a "high ranking police official gave the Kona officers preferential treatment due to a relationship he had with one of the Kona officers, a female." A Step II hearing was mutually waived, and the grievance was next heard, at the Step III level, by the

view pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law. Notwithstanding any other provisions of this chapter to the contrary, for the purposes of this section, the term "person aggrieved" shall include an agency that is a party to a contested case proceeding before that agency or another agency.

(b) Except as otherwise provided herein, proceedings for review shall be instituted in the circuit court within thirty days after the preliminary ruling or within thirty days after service of the certified copy of the final decision and order of the agency pursuant to rule of court[.]

4. Article 4(A) of the collective bargaining agreement (the CBA) between Appellant State of Hawai'i Organization of Police Officers (SHOPO) and Appellee Hawai'i County Police Department, County of Hawai'i (the Employer), provides: "The Employer and [SHOPO] agree that neither party will discriminate against any employee because of [SHOPO] membership or non-membership or lawful activity in [SHOPO] or on the basis of race, color, creed, sex, age, marital status, or lawful political activity."

5. Article 35 of the CBA provides:

A. Nothing in this Agreement shall be construed as abridging, amending or waiving any rights, benefits or perquisites presently covered by statutes, rules or regulations of each jurisdiction that the employees have enjoyed heretofore except as specifically superceded by the terms of this Agreement.

B. It is agreed, however, that the aforementioned perquisites are subject to modifications or termination by the Employer, as conditions warrant, after prior consultation with [SHOPO]. When the Employer takes such action and the employee or [SHOPO] believes that the reason or reasons for the change is or are unjust the employee or [SHOPO] shall have the right to process such grievance through the Grievance Procedure set forth in Article 32, herein.

6. Article 54(E) of the CBA, entitled "Compensation Adjustment Upon Reallocation[,]" provides:

1. The following definitions shall be applicable to this paragraph:

a. "Reallocation Downward" means the reallocation of a position to a class assigned to a lower pay range in the salary schedule.

b. "Reallocation Upward" means the reallocation of a position to a class assigned to a higher pay range in the salary schedule.

2. Compensation following reallocation upwards shall be adjusted in the manner as adjustments for promotion.

3. Compensation adjustment for a reallocation downwards shall be in the manner prescribed in paragraph C.3. However, when downward reallocations are due to disciplinary, involuntary, or voluntary reasons, the employee's basic rate of pay shall be adjusted in the manner as adjustments for disciplinary, involuntary, or voluntary demotions, as applicable.

4. Compensation following reallocation of a position in a class to the same pay range shall be adjusted in the manner of adjustments for transfer.

County's director of personnel, Michael R. Ben, who denied the reallocation request on March 6, 1997:

> The crux of this grievance concerns the reallocation of Ms. Mejia. Reallocation as a classification matter, is a subject excluded from the scope of negotiations. Therefore, requesting a reallocation under the guise of the collective bargaining agreement is inappropriate and improper.

SHOPO and Mejia then took their case to the Step IV, arbitration phase of the CBA grievance process. The Arbitrator held a hearing on December 13, 1999. Both sides were represented by counsel. Forty-one documents and the testimony of six witnesses made up the record before the Arbitrator. As provided in the CBA, the hearing was limited to the single issue of whether the reallocation dispute was arbitrable.[7]

As summarized by the Arbitrator, the County's basic premise in the arbitration was, "that the matter is non-arbitrable since reallocation is a classification matter which is excluded from collective bargaining by law and not covered under the [CBA]." With respect to exclusion by law, HRS § 89–9(d), in pertinent part, "[e]xcluded from the subjects of negotiations ... matters of classification and reclassification[.]" As for coverage under the CBA, the County pointed to Article 32 of the CBA, under "Step IV. Arbitration[,]" subsection (b), which provides that, "[e]xcept as may otherwise be provided herein, no grievance may be arbitrated unless it involves an alleged violation, misinterpretation or misapplication of a specific term or provision of the Agreement." The County noted the absence of any such specific term or provision. The County dismissed Article 54(E) of the CBA, entitled "Compensation Adjustment Upon Reallocation[,]" *supra n.6*, as "nothing more than a definition [which] does not provide any authority for the Arbitrator to take jurisdiction to review the merits of a reallocation decision." The County also argued that the Arbitrator should respect the prior decision of the Commission and decline arbitral jurisdiction, "to avoid conflict."

After dismissing each of the County's arguments *seriatim*, the Arbitrator found the reallocation dispute to be within her arbitral jurisdiction. Along the way, the Arbitrator relied upon similar decisions by other arbitrators in like cases. These decisions, here lacking precedential or persuasive power, will not be discussed further. Otherwise, the Arbitrator relied primarily upon the Hawai'i Supreme Court's decision in *University of Hawai'i Professional Assembly (UHPA) v. University of Hawai'i*, 66 Haw. 207, 659 P.2d 717 (1983) (per curiam). In *UHPA*, the supreme court reversed the trial court's refusal to compel arbitration of the university's denial of promotion to certain faculty members. The university had argued that a previous version of HRS § 89–9(d)[8] precluded arbitration of controversies over promotion and tenure. The supreme court took a more moderate path:

> The University argues that the statute clearly prohibits it from delegating any of

---

**7.** Article 32 of the CBA, at "Step IV. Arbitration[,]" subsection (d), provides that "[i]f the Employer disputes the arbitrability of any grievance under the terms of this Agreement, the Arbitrator shall first determine whether the Arbitrator has jurisdiction to act; and if the Arbitrator finds that the Arbitrator has no such jurisdiction, the grievance shall be referred back to the parties without decision or recommendation."

**8.** In *University of Hawai'i Professional Assembly v. University of Hawai'i*, 66 Haw. 207, 659 P.2d 717 (1983) (per curiam), the Hawai'i Supreme Court construed the following version of the statute:

HRS § 89–9(d)(7) reads:

The employer and the exclusive representative shall not agree to any proposal which would be inconsistent with merit principles or the prin-ciple of equal pay for equal work pursuant to sections 76–1, 76–2, 77–31, and 77–33, or which would interfere with the rights of a public employer to (1) direct employees; (2) determine qualification, standards for work, the nature and contents of examinations, hire, promote, transfer, assign, and retain employees in positions and suspend, demote, discharge, or take other disciplinary action against employees for proper cause; (3) relieve an employee from duties because of lack of work or other legitimate reason; (4) maintain efficiency of government operations; (5) determine methods, means, and personnel by which the employer's operations are to be conducted; and take such actions as may be necessary to carry out the missions of the employer in cases of emergencies.

*Id.* at 208–09 n. 1, 659 P.2d at 718 n. 1.

its power to grant promotion and tenure, and therefore, by law, the subject could not be part of the contract. If not part of the contract, then the subject is barred from arbitration.

We do not read § 89–9(d)(7) to give such sweeping power to the University so that all matters mentioned there are sacrosant [ (sic) ] and inviolable by collective bargaining. In addition to promotion, the statute prohibits interference with disciplinary action and means by which operations are conducted, which might encompass working conditions. To bar those subjects from negotiation completely would leave little for a collective bargaining agreement to cover.

We believe that there is a more reasonable way to interpret this statute. UHPA does not dispute, nor do we question, the power of the University to establish criteria. Once the criteria are established, however, the procedure of review must fairly follow the criteria. Otherwise, the criteria are meaningless and may become a facade for unfair or discriminatory practice.

A review of the fairness of the procedure does not infringe upon the power to promote or grant tenure. The agreement limits the power of the arbitrator in that he is not to substitute his judgment for that of a University official unless he finds the University's decision to be arbitrary and capricious. The arbitrator, therefore, must accept the criteria established by the University in every case, and follow the University's interpretation unless he finds the University itself has failed to apply its criteria.

We interpret § 89–9(d)(7) to allow for arbitration in these cases, also because we would require more direct language in a statute to allow it to take away the bargained-for remedy of arbitration. One

purpose of arbitration is to quell unrest before it kindles a strike. Since strikes by public workers can be very disruptive and dangerous to the health of the state, calming tensions through arbitration is more imperative in the public sector than in the private sector. We agree with those courts which favor arbitration in the area of promotion and tenure of public employees in the field of education.

*Id.* at 211–12, 659 P.2d at 719–20 (citations and footnotes omitted). From *UHPA,* our Arbitrator apparently gleaned an overriding general principle—that the fairness of any management procedure, *vis à vis* its impact upon employee rights or benefits under a collective bargaining agreement, is fair game for arbitration, regardless of whether the procedure is a subject of collective bargaining under the agreement. In her February 8, 2000 arbitration decision and award, the Arbitrator ruled that "review of the fairness of the procedure is covered by the [CBA], and it is the Arbitrator's opinion that there are sufficient grounds for asserting her jurisdiction, finding that the contractual provisions permit arbitral jurisdiction."

### C. Circuit Court Review.

On February 17, 2000, the County moved the court, pursuant to HRS § 658–9(4), to vacate the Arbitrator's decision and award, "on the grounds that the Arbitrator 'exceeded her powers' in finding that she had jurisdiction over the matter." At the conclusion of the March 17, 2000 hearing on the motion, the court orally ruled in favor of the County. The court's April 4, 2000 written order vacating the Arbitrator's award contained the following conclusions of law:

1. This case arises from SHOPO's efforts to reverse a Classification decision made by the County, as defined in H.R.S. § 76–14; [9]

> The director of human resources development shall direct and supervise all the administrative and technical activities of the director's department. In addition to other duties imposed upon the director by this chapter and chapter 77, the director shall:
>
> . . . .
>
> (8) Develop and maintain a position classification plan; and

9. HRS § 76–14 (1993 & Supp.2001 (section effective until June 30, 2002)) provided that "[t]he civil service commission shall hear and decide appeals from any action of the director of human resources development under this chapter, as well as from dismissals, demotions, and suspensions as hereinafter provided." HRS § 76–13(8) (Supp.2001 (section effective until June 30, 2002)) provided, in relevant part:

2. H.R.S. § 89–9(d) excludes Classification matters from collective bargaining negotiations, and therefore from coverage by [the CBA];

3. The instant Arbitrator, whose authority arises under [the CBA] therefore has no arbitration jurisdiction over the disputed Classification decision, and the proper remedy for SHOPO was an appeal through [the Commission], not arbitration under [the CBA].

4. In finding that she had arbitration jurisdiction over this Classification matter, The Arbitrator exceeded her powers, and rendered an Award in violation of public policy as expressed by statute.

(Footnote supplied.) On April 20, 2000, SHOPO filed a timely notice of this appeal.

## III. Discussion.

SHOPO presents two points of error on appeal:

1. The Circuit Court erred in ruling that an arbitrator, who was selected in accordance with a collective bargaining agreement, exceeded her authority under HRS § 89–9(d) in assuming arbitral jurisdiction to review [the County's] actions or inactions as to whether they negatively impacted [Mejia's] rights or benefits under [the CBA] or discriminated against her.

. . . .

2. The Circuit Court erred in ruling that the arbitrator, who ruled that she has arbitral jurisdiction to review [the County's] actions or inactions as to whether they negatively impacted [Mejia's] rights or benefits under [the CBA] or discriminated against her, violated the public policy of HRS § 89–9(d).

Opening Brief at 5–6. On both points, we disagree.

 "The issue whether the circuit court erred in confirming the Final Award of the

Arbitrator requires an interpretation of HRS §§ 658–8 (1993), 658–9 (1993), and 658–10 (1993). The interpretation of a statute is a question of law reviewable *de novo.* . . . We review the circuit court's ruling on an arbitration award *de novo,* but we also are mindful that the circuit court's review of arbitral awards must be extremely narrow and exceedingly deferential." *Tatibouet v. Ellsworth,* 99 Hawai'i 226, 232–33, 54 P.3d 397, 403–4 (2002) (brackets, footnotes, citations and internal quotation marks omitted).

The general contours of our review of an arbitration award are well established:

This court has decided to confine judicial review [of arbitration awards] to the strictest possible limits.

We reaffirm this holding because we believe an extensive judicial review of arbitration awards would frustrate the intent of the parties to avoid litigation and would also nullify the legislative objective in the enactment of [HRS chapter 658].

The parties have voluntarily agreed to arbitrate, and they thereby assumed all the hazards of the arbitration process, including the risk that the arbitrators may make mistakes in the application of law and in their findings of fact. . . . [T]his court held that such mistakes of arbitrators did not vitiate awards and that the review of awards by the courts were limited by the provisions of the arbitration statute.

*Mars Constructors, Inc. v. Tropical Enterprises, Ltd.,* 51 Haw. 332, 335–36, 460 P.2d 317, 319 (1969) (per curiam) (citations omitted). *See also AOAO of Tropicana Manor v. Jeffers,* 73 Haw. 201, 206, 830 P.2d 503, 507 (1992) ("the courts have no business weighing the merits of the arbitration award" (citation, ellipsis, internal quotation marks and brackets omitted)); *Tatibouet,* 99 Hawai'i at 233, 54 P.3d at 404.

(A) Create and adjust classes of positions and adopt class specifications including title, description of typical duties and responsibilities, statement of training and experience, and other requirements to be met by applicants, covering all positions;

(B) Allocate each position and each newly created position to the appropriate class;

(C) Reallocate positions to recognize material changes in duties and responsibilities or to correct a previous action . . . .; and

(D) Determine the status of employees holding positions affected by classification actions[.]

Accordingly, a trial court is authorized to vacate an arbitration award only on one or more of the four grounds specified in HRS § 658-9,[10] and to modify or correct an award only on one or more of the three grounds specified in HRS § 658-10.[11] *Mars,* 51 Haw. at 336, 460 P.2d at 319; *Jeffers,* 73 Haw. at 205-6, 830 P.2d at 507; *Tatibouet,* 99 Hawaiʻi at 233, 54 P.3d at 404. HRS §§ 658-9 and 658-10 "also restrict the authority of appellate courts to review judgments entered by circuit courts confirming the arbitration awards." *Jeffers,* 73 Haw. at 206, 830 P.2d at 507 (brackets, citation and internal quotation marks omitted). Of the permissible grounds for vacating an award, HRS § 658-9(4) ("Where the arbitrators exceeded their powers") applies where the arbitrator lacked jurisdiction to enter the award. *Jeffers,* 73 Haw. at 210, 830 P.2d at 509.

"As a general rule, the courts should determine whether a dispute is subject to arbitration[,]" *Bateman Constr., Inc. v. Haitsuka Bros. Ltd.,* 77 Hawaiʻi 481, 485, 889 P.2d 58, 62 (1995), "unless the parties clearly and unmistakably provide otherwise." *Id.* at 485, 889 P.2d at 62 (brackets, citations and internal quotation marks omitted). *See also Bronster v. United Pub. Workers, AFSCME, Local 646, AFL-CIO,* 90 Hawaiʻi 9, 14, 975 P.2d 766, 771 (1999) (citing *Bateman, supra*).

In *Bronster,* the collective bargaining agreement in question provided that

if the Employer disputes the arbitrability of any grievance under the terms of this Agreement, the Arbitrator shall first determine whether he has jurisdiction to act; and if he finds that he has no such power, the grievance shall be referred back to the parties without decision on its merits.

*Bronster,* 90 Hawaiʻi at 10, 975 P.2d at 767 (original emphasis, brackets and internal block quote format omitted). The *Bronster* court pointed out that this provision was "nearly identical" to a provision interpreted in *UHPA, supra. Id.* at 14, 975 P.2d at 771. Thereupon, the *Bronster* court concluded that, "Without question, here, as in *UHPA,* the agreement calls 'clearly and unmistakably' for the arbitrator to decide the arbitrability of a grievance." *Id.* at 15, 975 P.2d at 772. In so concluding, the *Bronster* court quoted from *UHPA:*

[w]here the agreement calls for the arbitrator to decide the issue of arbitrability, the court should compel arbitration. *United Merchants & Manufacturers v. American Textile Co.,* 512 F.Supp. 757 (S.D.N.Y. 1981). For a court to decide the issue of whether a particular grievance arises under the agreement or not would take away completely the power that the parties agreed to give the arbitrator. The arbitration process may only be used when the grievance involves the violation of a provision of the agreement. Thus the questions of arbitrability and whether the agreement

---

10. HRS § 658-9 (1993) provides:

In any of the following cases, the court may make an order vacating the award, upon the application of any party to the arbitration:
(1) Where the award was procured by corruption, fraud, or undue means;
(2) Where there was evident partiality or corruption in the arbitrators, or any of them;
(3) Where the arbitrators were guilty of misconduct, in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence, pertinent and material to the controversy; or of any other misbehavior, by which the rights of any party have been prejudiced;
(4) Where the arbitrators exceeded their powers, or so imperfectly executed them, that a mutual, final, and definite award, upon the subject matter submitted, was not made.
When an award is vacated and the time, within which the agreement required the award to be made, has not expired, the court

may in its discretion direct a rehearing by the arbitrators.

11. HRS § 658-10 (1993) provides:

In any of the following cases, the court may make an order modifying or correcting the award, upon the application of any party to the arbitration:
(1) Where there was an evident miscalculation of figures, or an evident mistake in the description of any person, thing, or property, referred to in the award;
(2) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matters submitted;
(3) Where the award is imperfect in a matter of form, not affecting the merits of the controversy.
The order may modify and correct the award, so as to effect the intent thereof, and promote justice between the parties.

is involved are one and the same. The University would have the court decide arbitrability by casting the issue in a different light, that of what the agreement covers. We would thereby decide all disputes of arbitrability, which is the very issue the parties agreed to submit to the arbitrator. This issue, therefore, should be decided in arbitration.

*Id.* at 14–15, 975 P.2d at 771–72 (quoting *UHPA,* 66 Haw. at 210, 659 P.2d at 719) (internal block quote format omitted; brackets in the original).

■ In our case, we might also point to language in the CBA virtually identical to that interpreted in *UHPA.* Article 32 of the CBA, at "Step IV. Arbitration[,]" subsection (d), provides that

[i]f the Employer disputes the arbitrability of any grievance under the terms of this Agreement, the Arbitrator shall first determine whether the Arbitrator has jurisdiction to act; and if the Arbitrator finds that the Arbitrator has no such jurisdiction, the grievance shall be referred back to the parties without decision or recommendation.

*UHPA* and its offspring in this respect, *Bronster,* thus imply that the Arbitrator in this case properly assumed arbitral jurisdiction. And this, indeed, is the essential thrust of SHOPO's arguments on appeal.[12]

We observe, however, that the *UHPA* passage quoted in *Bronster* was prefaced and conditioned, thus: "Were there no statutes concerning collective bargaining in the public sector, such as § HRS 89–9(d), our decision would be simple." *UHPA,* 66 Haw. at 210, 659 P.2d at 719. The *Bronster* court recognized as much, prefacing its quotation from *UHPA,* thus: "[The *UHPA* court] held that the university was not prohibited by statute from bargaining about promotion and tenure standards, *id.* at 211–13, 659 P.2d at 719–20[.]" *Bronster,* 90 Hawai'i at 14, 975 P.2d at 771. Hence, *UHPA* and *Bronster* both acknowledged that the agreement of the parties to submit issues of arbitral jurisdiction to the arbitrator may be overridden by statute.

The *UHPA* court held that the agreement of the parties in its case prevailed because the statute touted by the university as contravening, *supra n.8,* was general, diffuse and preclusive only by implication, and the university's interpretation of the statute overreaching and unreasonable. *UHPA,* 66 Haw. at 211, 659 P.2d at 719. The *UHPA* court expressly recognized, however, that a genuinely preclusive statute will oust arbitral jurisdiction: "We interpret § 89–9(d)(7) to allow for arbitration in these cases, also because we would require more direct language in a statute to allow it to take away the bargained-for remedy of arbitration." *Id.* at 212, 659 P.2d at 720.

■ Unlike the language of the statute in *UHPA,* the language of HRS § 89–9(d) is specific, trenchant and direct, and really needs no interpretation: "Excluded from the subjects of negotiations are matters of classification and reclassification[.]" We conclude thereupon, under *UHPA* and *Bronster,* that the Arbitrator lacked arbitral jurisdiction in this case. To the extent that *Bateman, supra,* implies that the County waived its objection to arbitral jurisdiction by submitting the question to the Arbitrator, *Bateman,* 77 Hawai'i at 485–86, 889 P.2d at 62–63, we note that *Bateman*—and *Bronster,* for that matter—did not involve a preclusive statute. We also note *Jeffers,* 73 Haw. at 211, 830 P.2d at 509 ("It is well-settled that parties cannot waive subject matter jurisdiction." (Citations omitted.)).

Taking what may be only a superficially different and alternative approach, we reference *Inlandboatmen's Union v. Sause Bros., Inc.,* 77 Hawai'i 187, 194, 881 P.2d 1255, 1262 (App.1994), in which we went beyond the cabined appellate review specified in HRS §§ 658–9 and 658–10, *Inlandboatmen's Union,* 77 Hawai'i at 193, 881 P.2d at 1261, and held that an arbitration award may be vacated if it clearly violates some explicit, well defined and dominant public policy. *Id.* at 193–94, 881 P.2d at 1261–62. Following in the footsteps of the United States Supreme

---

12. On appeal, and inexplicably, SHOPO also relies heavily upon the reasoning and results reached by other arbitrators in similar cases, just as the Arbitrator did below in rendering her arbitration decision and award.

Court in *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987), we grounded this public policy exception upon "the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy." *Inlandboatmen's Union,* 77 Hawai'i at 193, 881 P.2d at 1261 (quoting *Misco,* 484 U.S. at 42, 108 S.Ct. 373) (internal block quote format omitted).

We fashioned a standard for determining whether an arbitration award is subject to vacation in violation of public policy, from the two-prong test promulgated in *Misco:*

> In *Misco,* the U.S. Supreme Court considered "the question of when courts may set aside arbitration awards as contravening public policy." *Id.* at 35, 108 S.Ct. at 369, 98 L.Ed.2d at 297. In doing so, it did "not ... sanction a broad judicial power to set aside arbitration awards as against public policy." *Id.* at 43, 108 S.Ct. at 373, 98 L.Ed.2d at 302. Under *Misco,* the test established for application of the public policy exception requires a court to determine that (1) the award "would violate 'some explicit public policy' that is 'well defined and dominant, and [that] is ... ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests[,]' " and (2) the "violation of [the public] policy [is] clearly shown." *Id.* (quoting *W.R. Grace & Co. [v. Local Union 759, Int'l Union of the United Rubber Workers],* 461 U.S. [757,] 766, 103 S.Ct. [2177,] 2183, 76 L.Ed.2d [298,] 307 [1983] ). Hence, "[a] refusal to enforce an [arbitration] award must rest on more than speculation or assumption." *Id.* at 44, 108 S.Ct. at 374, 98 L.Ed.2d at 302.

*Inlandboatmen's Union,* 77 Hawai'i at 193–94, 881 P.2d at 1261–62 (ellipses and some brackets in the original).

■ Hence, in our case, we must determine whether the Arbitrator's assumption of arbitral jurisdiction clearly violated some explicit, well defined and dominant public policy. We conclude that it did. HRS § 89–9(d) precludes collective bargaining over classification issues and hence, places them out of the reach of the Arbitrator, who derives her jurisdiction and authority from the CBA. As noted previously, the command of HRS § 89–9(d) is explicit and unambiguous. And it is dominant, as HRS chapter 89 is no less than the legislature's paradigm for all collective bargaining agreements. *See* HRS § 89–1 (1993 & Supp.2001). To allow arbitral jurisdiction over classification matters would clearly violate the preclusion contained in HRS § 89–9(d). By the same token, it would also clearly derogate the legislature's explicit and unambiguous intention to place classification issues under the jurisdiction of the Commission. HRS § 76–14; HRS § 76–13(8) (*supra, n.9* ). Read together, HRS §§ 89–9(d) and 76–14 cast in sharp relief the Legislature's scheme to exclude classification issues from the collective bargaining process and place them squarely under the authority of the Commission. Accordingly, we again conclude that the Arbitrator lacked arbitral jurisdiction in this case.

It is no answer simply to draw a conceptual line between fairness and remedy on the one hand and the County's classification decision on the other, as the Arbitrator did below and SHOPO does on appeal. It takes true tunnel vision not to see that arbitrating the one is tantamount to arbitrating the other. And while we agree with SHOPO that the twin goals of the collective bargaining law— "to promote harmonious and cooperative relations between government and its employees and to protect the public by assuring effective and orderly operations of government"—are fostered by collective bargaining "on matters of wages, hours, and other conditions of employment," HRS § 89–1, nevertheless, to allow arbitral jurisdiction over classification matters is to countenance collective bargaining over the very structure of the government itself. That is the crux of the violation of public policy that is salient here. To SHOPO's plaint that the court's rejection of arbitral jurisdiction deprived Mejia of the opportunity to be heard and to present her case on the merits, we can only respond that SHOPO and Mejia availed themselves fully of the opportunity to be heard and present a case before the Commission, and could have had a further "day in

court" had they chosen to proceed further under HRS § 91–14 (*supra n.3* ).

### IV. Conclusion.

For the reasons outlined above, we affirm the April 4, 2000 order of the court.